```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED  6/23/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SHAUNIQUA SMITH-SIEGEL           :
                                 :
                Plaintiff,       :
                                 :        09 Civ. 0613 (JGK)(THK)
        -against-                :
                                 :        **REPORT AND RECOMMENDATION**
MICHAEL J. ASTRUE,               :        Pro Se
Commissioner of Social Security, :
                                 :
                Defendant.       :
----------------------------------X

**TO: HON. JOHN G. KOELTL, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff, Shauniqua Smith-Siegel ("Plaintiff"), proceeding pro se, commenced this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's determination that she was ineligible for Supplemental Security Income ("SSI") benefits based on disability. Defendant, the Commissioner of Social Security ("the Commissioner" or "Defendant"), has moved for judgment on the pleadings, requesting an order affirming the Commissioner's decision and dismissing the Complaint. The motion was referred to this Court for a Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons that follow, the Court recommends that the Commissioner's motion be granted and this case be dismissed with prejudice.

## BACKGROUND

### I. Procedural History

On July 20, 2005, Plaintiff applied for disability insurance benefits ("DIB") and supplemental social security income ("SSI") benefits, claiming that she had become disabled and unable to work on November 15, 1999 (See Record ("R."), at 63-65, 255-57); she also applied for disabled-child benefits from the account of her deceased father, because she had been disabled since age 16. (See id. at 65.) At the time of her application, Plaintiff was 22 years old. (See, e.g., id. at 167.)

On December 7, 2005, Plaintiff's claims were denied. (See id. at 51, 258-61.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), (see id. at 52), which was held on May 2, 2007, with Plaintiff appearing pro se before ALJ Katherine C. Edgell. (See id. at 288-311.) The ALJ initially found that Plaintiff was not disabled because she was able to perform past relevant work, but that decision was vacated by the Appeals Council, which found that Plaintiff did not have past relevant work for the purposes of that analysis. (See id. at 35-37.) The ALJ held a second hearing on March 26, 2008, (see id. at 262-87), after which she determined that Plaintiff was not disabled because there was work in the national economy that she was capable of performing. (See id. at 22.) The Appeals Council denied Plaintiff's request for review of that decision on October 20, 2008. (See id. at 4-5.) Plaintiff commenced this action on

November 17, 2008.[1]

## II. Medical Evidence

Plaintiff's claimed disability relates to her mental health. The administrative record contains medical evidence of Plaintiff's mental health treatment during the alleged disability period, as well as some documentation of treatment she received prior to that period. The record also contains the results of two consultative evaluations by state agency psychologists Ann Herrick and Leslie Helprin.[2]

---

[1] Plaintiff originally filed this action in the Northern District of New York, but is in fact a resident of the Southern District of New York. The action was therefore transferred to this Court on November 19, 2008.

[2] Plaintiff has also submitted evidence from outside the administrative record. In response to Defendant's motion, she submitted (1) a second evaluation by Dr. Helprin, from May 2009; (2) a form from the Rockland County Department of Social Services stating that Plaintiff is exempt from participating in temporary assistance work activities as of July 2009 because of a "medical issue;" (3) a letter from the Legal Aid Society of Rockland County stating that they are unable to represent her in this matter; and (4) a New York State Department of Health report describing Plaintiff's adoption as a young child. However, that evidence is not properly considered here. A plaintiff seeking review of her claim on the basis of new evidence must show (1) that the proffered evidence is "new," and not merely cumulative of what is already in the record, (2) that it is "material," meaning that it is both relevant to the claimant's condition during the time period for which benefits were denied, and that there is "a reasonable possibility that the new evidence would have influenced the Secretary to decide [the] claimant's application differently," and (3) that there is "good cause for her failure to present the evidence earlier." Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (citing Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981));

## A. Evidence From Treating Clinicians

### 1. Medical Records From Prior to the Alleged Disability Period

Plaintiff submitted records of treatment for mental health problems at the Rockland County Department of Mental Health ("RCDMH") during her childhood, before the period at issue here. In June 1996, Plaintiff was diagnosed with oppositional defiant disorder with aggressive features, dysthymia, and parent-child relational problems. (See id. at 236.) (Plaintiff had been adopted in 1994 after being removed from her biological parents due to abuse and neglect, and then being sexually abused while in foster care.) (See id. at 235.) In June 1998, she was diagnosed with bipolar disorder, post-traumatic stress disorder, and a childhood-onset type conduct disorder, as well as an unspecified "Axis II learning disability." (See id. at 148, 153.)

In 1998, Plaintiff was hospitalized at the Rockland Children's Psychiatric Center for approximately two months, after she became violent with her family and peers. (See id. at 147-49.) The hospital evaluation noted that she was having legal problems and peer problems, along with her continuing parental problems, and

---

Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985); see also 42 U.S.C. § 405(g). None of this new evidence is material. The Helprin report and work exemption both post-date the ALJ's decision, and do not refer to the period of alleged disability. The Legal Aid letter is not probative of any of Plaintiff's claims. The adoption report is also largely irrelevant to the disability claim, because it describes Plaintiff's difficulties as a small child, not during the disability period.

4

found that she needed to learn to control her aggressive behavior, to talk about her feelings, and to develop a more appropriate coping style. (See id. at 143.) In the hospital, Plaintiff was able to control her rage and displayed acceptable behavior. However, her treatment team believed that medication would be necessary in order for her to maintain stability. (See id. at 152.) At the time of discharge, her global assessment of functioning ("GAF") score was listed as 40 out of 90. (See id. at 149.)

### 2. Medical Records From the Alleged Disability Period

### a. Treatment and Evaluation at RCDMH

Plaintiff received therapy at RCDMH from August 22, 2005 through February 10, 2006. (See id. at 210.) Plaintiff was diagnosed with bipolar disorder, adjustment disorder with depressed mood, and dysthymic disorder. (See id. at 211.)

In September 2005, Plaintiff underwent a court-ordered psychiatric evaluation with RCDMH Nurse Practitioner Vivian Hlubik. (See id. at 155-58.) Hlubik found that Plaintiff showed normal function, including appropriate dress, eye contact, and affect, a calm mood and cooperative attitude, and intact attention and concentration. (See id. at 158.) Plaintiff's intelligence was average, and her thought process and memory were intact. However, her insight was poor. (See id.) Plaintiff reported that her mood was "okay," but that she felt sad at times, struggled with negative

thoughts about others' opinions of her, had difficulty sleeping, and struggled with impulsivity. (See id. at 155-56.) She also reported feeling angry at times, and "paranoid" that "people are coming in to hurt me and my baby." (Id. at 156.) Plaintiff did not display any overt delusional thinking or pressured speech. She reported that she would like medication to help her sleep and stabilize her mood. (See id.) Hlubik prescribed seroquel, and recommended that Plaintiff be given therapy to work on anger management and impulsivity control. (See id. at 159.)

Hlubik also filled out a form report for the New York State Office of Temporary and Disability Assistance. (See id. at 159-65.) She described Plaintiff's symptoms as anxiety with some irritability, and mood instability. (See id. at 159.) When asked for her medical opinion regarding Plaintiff's ability to do work-related mental activities, Hlubik responded that Plaintiff's "psychiatric symptoms need to be stabilized on medication," and that "medication management is currently in progress." (Id. at 163.) However, Hlubik found that she was unable to assess Plaintiff's ability to function in a work setting. (See id. at 163-65.)

Plaintiff's treatment at RCDMH consisted of weekly therapy sessions with a social worker, the drugs topamax and trazodone, and monthly medication management sessions. (See id. at 210-11.) However, Plaintiff was inconsistent in complying with her treatment

6

plan.   In February 2006, she informed her clinician that she had stopped taking her medication weeks prior to terminating treatment, and "only came to the clinic in order to be eligible for SSI benefits." (See id. at 210.)   Plaintiff failed to show up for her final appointment, and then contacted the clinic by telephone, informing them that she would seek treatment elsewhere.   (See id.)

b. Treatment at Family Care of Rockland

Plaintiff received treatment from Family Care of Rockland from March, 2006 through September 26, 2006.   (See id. at 215, 218.)   At the beginning of that period, Dr. Seymour Kushnir, a psychiatrist, diagnosed Plaintiff with adjustment disorder and borderline personality disorder. (See id. at 215.)   At the time of discharge, Sharon Weisz, a clinical social worker, listed her diagnoses as bipolar disorder and borderline personality disorder.

On March 9, 2006, Dr. Kushnir filled out a report for the Office of Vocational and Educational Services for Individuals with Disabilities (VESID), in which he estimated Plaintiff's mental health, and her work ability, as "good." (See id. at 216.)   He described Plaintiff's functional limitations as "limited stress," and noted that interpersonal factors, such as being a single parent and struggling with interpersonal relations, were sources of stress for Plaintiff.   (See id.)   Dr. Kushnir found that Plaintiff's mood was mildly depressed, and her affect was reactive.   However, her thought process was goal-directed and logical, and she was not

7

suicidal, homicidal, or delirious. (See id. at 215.) Plaintiff had good personal awareness and motivation (defined as "degree of understanding of capacities and limitations; realistic decision making skills; ability and willingness to participate in a structured work-related program"). (See id. at 216.)

Plaintiff was often late for her therapy sessions, and hostile to her therapist. (See id. at 219-23.) She was overly sensitive to criticism, and had difficulty accepting responsibility for her actions. (See id. at 220-21.) She was very often on the defensive, and appeared unmotivated. She did not keep her appointments, and when she did come, it was only because she was mandated to be there. (See id. at 218.) A court had ordered Plaintiff to undergo a psychological evaluation because she had been involved in credit card fraud, and she told her therapist that she was hoping to avoid jail time through a diagnosis of mental illness. (See id. at 221.) Plaintiff quit treatment at Family Care on September 26, 2006. (See id.)

The ALJ contacted Dr. Kushnir and requested that he complete an assessment form, but he declined to do so, noting that he had not treated Plaintiff in quite some time. (See id. at 127-28.)

c. Records From Harbor Crest Comprehensive Counseling Group

Plaintiff received care at Harbor Crest Comprehensive Counseling from June 2007 through the time of her second hearing (See id. at 250, 274.) There, she was treated by the clinic's

8

director, Randolph Bleiwas, a social worker.  She met with Mr. Bleiwas once a week for therapy.  (<u>See</u> <u>id.</u> at 241-48, 250, 252.) Bleiwas diagnosed Plaintiff with bipolar disorder and post-traumatic stress disorder ("PTSD").  (<u>See</u> <u>id.</u> at 252.) He believed that the PTSD was the result of Plaintiff's traumatic childhood, but had been re-triggered by the birth of her own child.  (<u>See</u> <u>id.</u>)

Bleiwas noted that Plaintiff's mental impairments "could be expected to interfere with employment," and that they would last for more than 12 months.  (<u>See</u> <u>id.</u>)

Bleiwas found that Plaintiff was often left agitated and frustrated by minor, everyday tasks, such as riding the bus to her therapy session.  (<u>See</u> <u>id.</u> at  241.)  Her disorders caused her to struggle with impulse control, anxiety, and depression, but these symptoms were improving with therapy.  (<u>See</u> <u>id.</u> at 247, 250.)

On July 10, 2008, Bleiwas also filled out a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form, in which he evaluated Plaintiff's functional capacity, based on his clinical experience with her. (<u>See</u> <u>id.</u> at 238-40.) He found that Plaintiff was "mildly limited" - defined as having "slight limitation," but generally being able to function well - in her ability to understand, remember, and carry out instructions, and to make judgments about simple work-related decisions, as well as in interacting appropriately with the public and responding appropriately to usual work situations.  (<u>See</u> <u>id.</u> at 238, 240.)

However, he cautioned that he had not given Plaintiff any testing that required her to follow complex instructions, which made her capabilities in that area difficult for him to ascertain. (See id. at 238.)  Bleiwas deemed Plaintiff "moderately limited" - defined as more than a slight limitation, but one that still allows the individual to function satisfactorily - in her ability to make judgments in complex work-related decisions.  Plaintiff's ability to interact appropriately with supervisors and coworkers could be either mildly or moderately limited, depending on the situation. (See id. at 240.)  He explained that Plaintiff's limitations were caused by her struggles with frustration, particularly with "the system," and with negotiating barriers to goals. He noted that her affect and judgment were also impaired at times, but that her judgment was generally good.  (See id.)

**B.  Consultative Evaluations**

1.  Evaluation by Consulting Psychologist Leslie Helprin, Ph.D.

Psychologist Leslie Helprin, Ph.D., conducted a consultative evaluation of Plaintiff on November 11, 2005.  (See id. at 167-71.) Helprin noted Plaintiff's history of hospitalization and diagnosis of bipolar disorder.  (See id. at 167.)

Helprin found that, at the time of the examination, Plaintiff suffered from dysphoric moods and crying spells.  (See id. at 168.) Plaintiff had difficulty falling asleep and reported a loss of appetite, but had not had any significant weight change.    She

10

denied having suicidal thoughts or symptoms of anxiety. However, she reported symptoms of mania, including "racing thoughts," being confrontational with others, saying whatever she wanted to say, and getting "really mad" and "vicious." (See id.) With regard to symptoms of a thought disorder, Plaintiff reported "hearing the neighbors talk about her." (Id.)

Helprin concluded that Plaintiff had "flighty" thought processes, impaired concentration due to "limited intellectual functioning and distractibility," mildly impaired recent and remote memory skills, and below-average intellectual skills. (See id. at 169.) However, Plaintiff was cooperative during the mental status examination, and presented adequate social skills. (See id. at 168.) She was dressed neatly, was well groomed, and presented appropriate gait, posture, eye contact, and motor behavior. (See id.) Her speech, affect, sensorium, and orientation were normal. (See id. at 169.) Helprin found that Plaintiff was "able to follow and understand simple directions and instructions, and perform simple, rote tasks and some complex tasks independently." (See id. at 170.) Plaintiff had difficulty maintaining attention, and sometimes had difficulty relating with others, but related to Helprin adequately during the evaluation.

Helprin also found that the results of the exam were consistent with psychiatric problems, which "may interfere with claimant's ability to function appropriately in a competitive

workplace on a daily basis." (See id.)  She concluded that, with continued and consistent treatment, Plaintiff would be able to deal with stress appropriately, but would require a supervised workplace until her treatment took full effect. (See id.)

2. Evaluation by State Agency Psychologist Ann Herrick, Ph.D.

On December 6, 2005, state agency psychologist Ann Herrick evaluated the medical evidence of record.  Herrick diagnosed Plaintiff with bipolar disorder II with paranoid features. (See id. at 175.)

When asked for her medical disposition in Plaintiff's case, Herrick checked a box stating that there was insufficient evidence to assess whether Plaintiff had a severe impairment. (See id. at 191.) However, Herrick found that Plaintiff retained sufficient residual functional capacity ("RFC") to be capable of understanding, remembering, attending, concentrating, and persisting in work related tasks, but would "do best in a position not requiring a lot of social interaction." (Id. at 175.)

Herrick did evaluate Plaintiff's limitations in performing specific tasks and skills.  She found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, to accept instructions, to respond appropriately to criticism from supervisors, to complete a

12

normal workday and workweek without being interrupted by her psychological symptoms, and to perform at a consistent pace without needing an unreasonable number of rest periods. (See id. at 173-74.) Plaintiff was not significantly limited in any other work-related functions. (See id. at 173-74.)

Herrick found that Plaintiff's mental status exam was "remarkable for impaired attention, concentration, [and] memory." (See id. at 175.) However, she was able to handle the activities of daily life, including living independently, handling household-related tasks, going out independently, taking public transportation, and paying bills. (See id.)

## III. Hearing Testimony

### A. The First Hearing

The first hearing on Plaintiff's application was held on May 2, 2007. (See id. at 290.)

Plaintiff testified that she lived with her son Airiel, who was two and a half-years-old at the time. (See id. at 292.) He had been born prematurely, and suffered from developmental delays. (See id. at 292, 294.) However, in 1999, the time of her alleged disability onset, she had been living with her parents. (See id. at 293.) Her only sources of income were public assistance and her son's SSI benefits. (See id. at 294.)

Plaintiff had completed a GED, and had enrolled in Westchester Community College in January 2005, but had dropped two of the five

13

classes she had signed up for. (See id. at 294-95.) She stated that she was taking courses in "civil sciences, political things." (See id. at 295.) She was able to input information into a computer, and had basic office skills. (See id.)

Plaintiff's most recent job had been as a telemarketer for DRG Telemarketing. She worked there part-time, while living at home with her parents, for approximately 6 months in 2004. (See id. at 296.) Plaintiff stated that she left that job because her boyfriend did not want her to work there any more. (See id. at 297.) Before that, she worked as a telemarketer for Domus Mortgage Services, taking loan applications over the phone. (See id. at 297-98.) She returned to the Domus job for approximately 6 months in 2004. (See id. at 298.) Plaintiff claimed that she was fired from the Domus position because "[they] don't like me." (See id. at 299.) Prior to that, in 2001, Plaintiff had done similar telemarketing work for Union Federal Mortgage. (See id.) Plaintiff gave somewhat inconsistent testimony about her reasons for leaving Union Federal, first claiming that "I wanted more money, so I might have left," but then saying that she had been let go because her boyfriend was also working there at the time, and the company felt that this raised a conflict of interest. (See id.)

The ALJ asked Plaintiff to describe her symptoms and conditions, and explain how they prevented her from working. (See

id. at 299.)  Plaintiff testified that she felt anxious every day, starting in the morning, before she went to school.  (See id. at 300.)   She felt that this anxiety "rub[bed] off" on her interviewers when she attempted to find a job, making them nervous about hiring her.  (See id.)

Plaintiff testified that she was not currently in psychiatric treatment, but was "looking into that" because she was a single mother with a special needs child, and needed "time and resources to look for the person who can help me the best."  (See id. at 300-01.)  She did not want to be on medication, because it made her feel groggy, and she was afraid that it might prevent her from caring for her son properly or responding to an emergency.  (See id. at 301-02.)

Plaintiff's typical day was to get up at 9:00 A.M., and give her son breakfast while watching television with him.  She would then  clean up the house, shower, and take her son to daycare, and then go to school.  (See id. at 304.) A bus picked her son up from daycare to take him to school, and then brought him back to daycare at 4:00 P.M.  (See id. at 305.)  Plaintiff usually came home from school around 5:30 or 6:00, and would then pick her son up from daycare.  She did her own shopping, and handled her own bills. (See id. at 305.)

Plaintiff testified that she smoked cigarettes, but did not drink alcohol or use drugs.  (See id. at 307.)  Before her son was

born, she had spent time with friends.  They would "[g]o shopping, hang out, I love to dance, do dance in our rooms, do each other's hair.  Be a girl."   (See id. at 308.)   Since her child's birth, however, she no longer spent time with her friends, because she just wanted to "go to school and take care of [her] son."  (See id. at 307.)   She had not had boyfriends or a romantic personal life since her child was born.   (See id. at 308.)   Plaintiff did not participate in group activities, such as attending church, or being involved in any school groups, but claimed that she was planning to join a church after she received her grades at school.   (See id.) Her main social interaction was with a social worker who came to her home to "just [say] hi and talk."    (See id.)   Plaintiff testified that her disability made her feel "singled out" in social situations, as if she didn't belong.   (See id. at 308-09.)

**B.   The Second Hearing**

Plaintiff's second hearing took place on March 26, 2008. (See id. at 264.)   Once again, Plaintiff appeared pro se.

Plaintiff again testified that her only sources of income were public assistance and her son's SSI benefits.   (See id. at 268.) She stated that she had no additional training or schooling beyond her GED.   (See id. at 268.)   Her last employment had been in 2006, as an assistant manager for Tuesday Morning, Inc., a clothing store.   (See id. at 268-69.)   Plaintiff had worked in the back of the store, stocking shelves and assisting with inventory.   (See

id. at 270.)  The job ended because she was often late or absent because she had to care for her son.  (See id. at 270.)  Plaintiff testified that she had never held a full-time job for a sustained period of time.  (See id. at 271.)

Plaintiff testified that, since the previous hearing, her anxiety had gotten more severe, so that she often felt like she had difficulty breathing.  (See id. at 272.)  However, she was able to care for her son and take care of her own home herself.  (See id. at 275-76.)  She was not taking any medication, because she believed it interfered with her ability to care for her child. (See id. at 272.)  She was receiving care at the Harbor Crest Clinic, where she had been in therapy with Mr. Bleiwas for the past year.  Her social life was limited to visiting her parents.  (See id. at 277.)

The ALJ asked Plaintiff why she believed she would not be able to work as a telemarketer, or in a clothing shop, as she had in the past.  (See id. at 277.)  Plaintiff replied she was confident she could do that type of work, but that she struggled to get to work on time, and that caused her anxiety to build, which in turn made it difficult for her to address that problem with her employers. (See id. at 277-78.)  She explained that she had a difficult time handling the process of getting her son off to school, getting herself ready and gathering the things she needed for the day, and then taking a cab. (See id. at 278.)

Pat Green, a vocational expert, then testified via telephone about Plaintiff's ability to perform work in the national economy. (See id. at 278.)   She had reviewed Plaintiff's file and work history, and found that her past work as a telephone solicitor constituted semi-skilled work at a sedentary level, and her work as an assistant manager of a clothing store was skilled work at a light level.   (See id. at 279-80.)   In response to a series of hypothetical questions posed by the ALJ, Green testified that a person of Plaintiff's age, education, and history, who had only limited ability to perform highly complex or detailed jobs or to interact with co-workers on a frequent basis, would be able to work as a telemarketer, an assembler of small products, or a garment sorter. (See id. at 280-81.)   An individual with Plaintiff's background, whose only limitations were stress-related difficulties with interpersonal relations, could perform those same types of work, as well as work as a ticket-checker.   (See id. at 281.)   A person of Plaintiff's background who had difficulty maintaining attention and concentration would be able to perform those same jobs.   (See id. at 282-83.)   However, if a person of her background required a job that did not involve frequent interaction with either co-workers or the general public, then she could not perform the telemarketing work, but would still be capable of working as a ticket checker, small products assembler, or garment sorter.   (See id. at 284.)   Nevertheless, Green believed that if Plaintiff

required a "supervised workplace," or could not attend work punctually, then she would not be competitively employable. (See id. at 285-86.)

**IV. The ALJ's Decision**

In her second decision, which is under review here,[3] the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, (see R. at 19), and that she suffered from the severe impairments of bipolar disorder, adjustment disorder, and PTSD. (See id.) However, the ALJ found that those impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1. (See id.)

The ALJ concluded that Plaintiff had the residual functional capacity to perform work activities "at all exertional levels that do not require sustained interaction with co-workers, supervisors, and members of the general public, and which are primarily comprised of simple, rote tasks." (See id. at 19.) In arriving at that conclusion, she found that Plaintiff had not established that she had any exertional restrictions, and was therefore capable of performing the exertional demands of all types of work. (See id.) She also found that Plaintiff's mental conditions had resulted in no limitations on Plaintiff's ability to conduct her activities of

---

[3] The ALJ's first decision on Plaintiff's application was not included in the Administrative Record that was submitted to the Court, but is not under review here.

19

daily living; mild limitations on her ability to maintain concentration, persistence, and pace; and moderate limitations on her social functioning. (See id.) Plaintiff had not had any episodes of decompensation. (See id.) From those findings, the ALJ concluded that Plaintiff "retains the ability to perform simple, rote, repetitive tasks in a low-contact work environment." (See id.)

In coming to that conclusion, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to pruduce the alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the residual functional capacity determination. (See id. at 20.) Rather, she found, "the totality of the evidence leads to the conclusion that the claimant's inability to work is currently related more to her demands as a single parent and her school course load than due to her mental status." (Id.)

In particular, the ALJ noted that Plaintiff had not required any inpatient hospitalizations since the alleged onset date, and had undergone only sporadic outpatient mental health treatment, usually at the direction of the criminal justice system. (See id.) Dr. Kushnir had "assessed the claimant as having a good capacity for work activity," and "therapist Bleiwas has noted improvement with respect to the claimant's depression, anxiety, and impulse control."

20

(<u>Id.</u>)   The ALJ also found that "every mental status evaluation documented the claimant as being fully cooperative and oriented, with clear speech and normal thought processes."  (<u>Id.</u>)  Plaintiff was also able to engage in normal activities of daily life, including living independently, caring for her and her son's needs, attending school classes on a regular basis, and handling her own finances. (<u>See</u> <u>id.</u>)  Therefore, although Plaintiff was experiencing "some degree of psychiatric symptoms," these were "apparently being addressed by outpatient therapy," and "not chronicled as being preclusive of any and all manner of work-related activity."  (<u>Id.</u>)

With regard to the opinion evidence in the record, the ALJ declined to accord substantial weight to Bleiwas's opinion that Plaintiff was unable to work, because he was not an acceptable medical source under the regulations, and his conclusion that Plaintiff could not work was not consistent with his questionnaire responses, in which he stated that Plaintiff had only moderate functional limitations.   (<u>See</u>  <u>id.</u> at 20-21.)   The ALJ also discounted Helprin's findings that Plaintiff's attention and concentration were limited by impaired cognitive functioning, because "the evidence does not show any significant cognitive deficits, and it is noted that the claimant was able to attain her GED and take college level courses." (<u>See</u> <u>id.</u> at 21.)

The ALJ found that Plaintiff had no past relevant work experience within the definition set forth in 20 C.F.R. §§ 404.1565

and 416.965.  (See id. at 21.)  However, Plaintiff was a younger individual between the ages of 18 and 44, had at least a high school education, and was able to communicate in English.  (See id.) Therefore, the ALJ concluded, Plaintiff was able to perform jobs that exist in significant numbers in the national economy.  (See id.)  Relying on the testimony of the vocational expert, the ALJ found that Plaintiff could perform representative unskilled occupations, such as work as a telemarketer and small parts assembler. (See id. at 22.)  Therefore, she concluded, Plaintiff was not disabled.  (See id.)

## Discussion

## I. Legal Standard for Review of the Commissioner's Determination

Under the Act, a person is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is not disabling unless it is "of such severity that [a claimant] is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

In assessing a claim of disability, the Commissioner must consider the following factors: (1) objective medical facts; (2)

22

diagnoses or medical opinions based on those facts; (3) the claimant's or other witnesses' subjective evidence of pain or disability; and (4) the claimant's educational background, age, and work experience. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

SSA regulations set forth a five-step sequence to evaluate disability claims. See 20 C.F.R. § 404.1520(a)(4). The Second Circuit has explained the sequential evaluation process as follows:

> If the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002))); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); see also 20 C.F.R. §§ 404.1520, 416.920. Claimants bear the burden of proof with respect to the first four steps in the evaluation. See Burgess 537 F.3d at 128; Perez, 77 F.3d at 46; Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983). The Commissioner must prove, at the fifth step, that the claimant is capable of obtaining substantial gainful employment in the national

economy.  See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005);
see also Perez, 77 F.3d at 46 ("If the claimant satisfies her burden
of proving the requirements in the first four steps, the burden then
shifts to the [Commissioner] to prove in the fifth step that the
claimant is capable of working.").[4]

When evaluating the severity of a mental impairment, the
regulations require the use of a "special technique" at the second
and third steps of the sequential analysis.   See 20 C.F.R. §
404.1520a; Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008).
First, the ALJ must determine whether the individual has a
"medically determinable mental impairment."   See Kohler, 546 F.3d
at 266.   If the individual does have such an impairment, then the
ALJ must "rate the degree of functional limitation resulting from
the  impairment(s)  in  [...]  four  broad  functional  areas:  (1)
activities   of   daily   living;   (2)   social   functioning;   (3)
concentration,  persistence,  or  pace;  and  (4)  episodes  of
decompensation."  See id.  "If the degree of limitation in each of
the first three areas is rated "mild" or better, and no episodes of

_____

[4] As the Second Circuit has observed, in 2003, SSA
regulations were amended to modify the Commissioner's burden at
the fifth step, and now only require a demonstration "that there
is work in the national economy that the claimant can do."
Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).   The
regulations abrogated the standard enunciated in Curry v. Apfel,
209 F.3d 117, 123 (2d Cir. 2000), which placed the burden on the
Commissioner of demonstrating that the claimant possessed the
residual functional capacity to perform work that was generally
available in the economy.

decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe," and will deny benefits." Id. However, if the individual does have a severe mental impairment, then the ALJ will move on to step three of the sequential analysis, and compare the relevant mental findings and the functional limitation ratings to the criteria of listed mental disorders, in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. The ALJ's written decision must include a specific finding as to the degree of limitation in each of the four functional areas central to the special technique. See id. at 266; 20 C.F.R. § 404.1520a(e).

In presiding over a hearing on disability benefits, an "ALJ generally has an affirmative obligation to develop the administrative record," given the non-adversarial nature of the proceedings. Perez, 77 F.3d at 47. The ALJ must develop the plaintiff's "complete medical history" and make "every reasonable effort" to help the plaintiff get the relevant medical reports. 20 C.F.R. § 404.1512(d); see also Perez, 77 F.3d at 47.

This Court reviews the administrative record and the ALJ's decision to determine whether it is supported by substantial evidence and relies upon the correct legal standards. See 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004). Substantial evidence "means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." <u>Halloran</u>
<u>v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (quoting
<u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427
(1971)). Where an ALJ's findings are based on substantial evidence,
this Court must defer to them.    <u>See</u> <u>Barreto ex rel. Rivas v.</u>
<u>Barnhart</u>, No. 02 Civ. 4462 (LTS), 2004 WL 1672789, at *3 (S.D.N.Y.
July 27, 2004) (citing <u>Rosa</u>, 168 F.3d at 77). However, a court "may
not properly 'affirm an administrative action on grounds different
from those considered by the agency.'"    <u>Burgess</u>, 537 F.3d at 128
(quoting <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999)).   "[A]s
the propriety of the agency's action is to be judged solely by the
rationale it advances, 'that basis must be set forth with such
clarity as to be understandable.   It will not do for a court to .
. . guess at the theory underlying the agency's action . . . .'"
<u>NLRB v. Columbia Univ.</u>, 541 F.2d 922, 929 (2d Cir. 1976) (quoting
<u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196-97, 67 S. Ct. 1575, 1577
(1947)); <u>see</u> <u>Melville</u>, 198 F.3d at 52 (citing <u>Chenery</u> in reviewing
a denial of benefits by the Commissioner); <u>Hackett v. Barnhart</u>, 475
F.3d 1166, 1174-75 (10th Cir. 2007) (applying  <u>Chenery</u> in the social
security context).

## II. Legal Standard for Remand

After reviewing the decision of the Commissioner, a court may,
under 42 U.S.C. § 405(g), affirm, modify, or reverse the
Commissioner's decision, with or without a remand for a rehearing

or further explanation.  When a court concludes that an ALJ's decision is not supported by substantial evidence, or fails to correctly apply relevant legal standards, reversal is appropriate, see Tejada, 167 F.3d at 773, 775-76, and remand may be appropriate. For example, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).  However, a court can also reverse and remand solely for the calculation of benefits when "substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits." Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996) (quoting Gilliland v. Heckler, 786 F.2d 178, 184 (3d Cir. 1986)); accord Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983) ("[W]hen, as here, the reversal is based solely on the Secretary's failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment and the Secretary's finding that the claimant can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing unless the Secretary could offer additional evidence."); McCall v. Astrue, No. 05 Civ. 2042 (GEL), 2008 WL 5378121, at *22 (S.D.N.Y. Dec. 23, 2008) ("[W]here courts have 'had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [they] have [also] opted simply

to remand for a calculation of benefits.'") (quoting <u>Butts v. Barnhart</u>, 388 F.3d 377, 385-86 (2d Cir. 2004)); <u>Mackey v. Barnhart</u>, 306 F. Supp. 2d 337, 344 (E.D.N.Y. 2005) (remanding solely for a calculation of benefits where two treating doctors, supported by significant additional medical evidence, found the plaintiff's impairments to be totally disabling, and there was insufficient evidence in the record to support the Commissioner's rejection of their opinions).

**III. Application to the ALJ's Decision**

### A. The ALJ Properly Found that Plaintiff Suffers from Severe Mental Impairments

The ALJ properly applied the special technique and the five-step analysis mandated by the regulations when determining the severity of Plaintiff's mental impairments. At step 1, she found that Plaintiff was insured for a period of disability and disability insurance benefits through March 31, 2007, and that she had not engaged in substantial gainful activity since the alleged onset date, November 15, 1999. (<u>See</u> R. at 18-19.) At step 2, the ALJ determined that Plaintiff suffered from the severe impairments of bipolar disorder, an adjustment disorder, and PTSD.[5] (<u>See</u> <u>id.</u> at

---

[5] Plaintiff was also diagnosed by Dr. Kushnir with borderline personality disorder in 2006, as the ALJ discussed in her summary of the medical evidence, but there is no mention of it in her "severe impairment" findings. (<u>See</u> R. at 18.) However, this omission is of no consequence. It could not have altered the conclusion that Plaintiff did not meet or medically equal any of the listed impairments in Part 1 of the Appendix to 20 C.F.R. § 404, because the listing for borderline personality

19.) She found that Plaintiff's conditions "have resulted in no limitations in the claimant's ability to conduct her activities of daily living; a mild restriction for maintaining concentration, persistence, and pace; and a moderate limitation in sustaining social function. There have been no episodes of decompensation." (See R. at 19.) Those findings satisfy the requirements of the Kohler special technique, and were supported by substantial evidence.

First, the record shows that Plaintiff was capable of handling the activities of daily life. She lived independently, and was able to handle household chores and activities. As a single parent, she was caring for her special-needs child. She competently managed her own finances. (See, e.g., id. at 301-05.)

Substantial evidence also supports the conclusion that Plaintiff had mild restrictions in concentration, persistence, and pace. There was scant evidence of impairment from Plaintiff's treating clinicians. Nurse Hlubik found that Plaintiff's attention and concentration were intact, and neither Dr. Kushnir nor Mr. Bleiwas noted any deficits in these areas. One of the consultative evaluators, Helprin, found that Plaintiff had difficulty maintaining

---

disorder shares the same paragraph B criteria as those for bipolar disorder, adjustment disorder, and PTSD, and the ALJ concluded that those criteria had not been satisfied. (See id. at 19.) Nor would it have affected the RFC determination, because that was based on evidence of Plaintiff's specific limitations and abilities, not on a particular diagnosis. (See id. at 19-22.)

attention,[6] and the other, Herrick, found that she was "moderately limited" in her ability to maintain attention and concentration for extended periods.

The ALJ's conclusion that Plaintiff had moderate difficulties sustaining social function was also well-supported.    None of Plaintiff's clinicians found her more than moderately socially impaired.    Mr. Bleiwas found that she was mildly limited in her ability to interact appropriately with the public, and that, depending on the situation, she would be mildly or moderately limited in her ability to interact appropriately with her supervisors and coworkers.    (See id. at 238, 240.)    Dr. Helprin found that she presented "adequate" social skills.    (See id. at 168.)    Dr. Herrick found that Plaintiff was moderately limited in her ability to interact appropriately with the general public and to accept instructions and criticism from her supervisors, and was mildly limited in other social skills.    (See id. at 174.)    She concluded that Plaintiff would do best in a position that did not require a great deal of social interaction.    (See id. at 175.) Moreover, the record reflects that Plaintiff was always lucid, well-

---

[6] Moreover, the ALJ discounted Helprin's assessment that Plaintiff's attention and concentration were impaired "due to cognitive limitations and the need for a supportive work environment," because the medical evidence did not support those conclusions.    (See R. at 21.)    None of the other evidence in the record stated that Plaintiff suffered from cognitive difficulties, including the notes and reports from her treating clinicians.    And, notably, Plaintiff was able to obtain her GED, and to take college-level courses.

30

dressed, and cooperative during her mental status evaluations.

The record contains no evidence that Plaintiff suffered episodes of decompensation during the period at issue. The regulations define "decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." See 20 C.F.R. § 404, subpt. P., app. 1, § 12(C)(4). Episodes of decompensation may be demonstrated by "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation," or inferred from medical records showing significant alteration in medication, hospitalization, placement in a halfway house, or similar evidence showing the occurrence, severity, or duration of the episode. See id. There is no such evidence here. Although Plaintiff had been hospitalized for psychiatric treatment during adolescence, she was not hospitalized during the alleged disability period. Nor does the record reflect any sudden increases in medication or other treatment. Nurse Hlubik believed that Plaintiff needed to be "stabilized" on medication, but did not describe any episodes of deterioration or suddenly increased symptoms. (See id. at 163.) Although Bleiwas stated that the difficulties of single parenthood were "triggering" Plaintiff's post-traumatic stress disorder, he appears to have been referring

generally to the several years following her son's birth, rather than any particular incident or episode. (See id. at 252.) And, notably, he described Plaintiff as needing "[c]ontinued" counseling, and "possible" medication, rather than increased medication, supervision, or other treatment. (See id. at 250.)

### B. Plaintiff's Conditions Did Not Meet or Medically Equal Any Listed Impairments

At step 3, the ALJ found that Plaintiff's condition did not meet or medically equal any of the listed impairments in Part 1 of the Appendix to 20 C.F.R. § 404. The Court agrees. Section 12 of the Appendix sets forth the criteria for determining whether an individual's mental impairment is severe enough to preclude all work. See 20 C.F.R. § 416.925; 20 C.F.R. § 404, subpt. P., app. 1, § 12. For each listed disorder, there are "paragraph A" criteria, which set forth the disorder's specific medical characteristics, and "paragraph B" criteria, which set forth the functional limitations that the impairment must cause in order for the individual to be considered per se disabled. See 20 C.F.R. § 404, subpt. P., app. 1, § 12(A). For some disorders, there are also "paragraph C" criteria, which are to be considered in the alternative if the paragraph B criteria are not satisfied. See id. An individual will be found disabled if his impairment fulfills the requirements set forth in paragraph A, and the requirements of either paragraph B or C, for the disorder in question. (See id.)

Plaintiff's diagnoses of bipolar disorder, adjustment disorder,

and PTSD all share the same four paragraph B criteria, which require that the disorder result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. See 20 C.F.R. § 404, subpt. P., app. 1, §§ 12.04, 12.06. The ALJ found that Plaintiff's condition did not meet the paragraph B criteria, because the medical evidence did not support the conclusion that she had "marked" restrictions in any of those four areas. (See R. at 19.) That conclusion was supported by substantial evidence; as discussed above, the ALJ reasonably determined that Plaintiff had no episodes of decompensation or restrictions in her activities of daily living, only mild restriction in her ability to maintain concentration, persistence, and pace, and moderate limitation in sustaining social functioning. (See R. at 19.)

The Appendix also lists paragraph C criteria for Plaintiff's disorders, which are to be considered in the alternative if paragraph B criteria are not met. Although the ALJ did not specifically address those criteria, it is clear from the record that Plaintiff's condition does not satisfy them. The paragraph C criteria for affective disorders, including bipolar disorder, are:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused

more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, subpt. P., app. 1, § 12.04. These alternative criteria protect individuals whose symptoms have been controlled by treatment, but who nevertheless would be likely to become destabilized if placed in a competitive work environment. Plaintiff does not fit that description. Her treatment over the years has been sporadic, and several of the evaluations in the record were conducted at times when she was not receiving any treatment at all. Therefore, there is no reason to conclude that her symptoms were "attenuated by medication or psychosocial support." Nor is there evidence that she has had, or is at risk for, episodes of decompensation. Rather, Plaintiff has been employed and in school for various short periods, and while she was not ultimately successful in those endeavors, there is no indication that they caused her mental condition to deteriorate. Likewise, she has never required a supportive living arrangement. In fact, she is not only capable of functioning independently, but also able to care for her son as a single parent.

Anxiety disorders, including PTSD, have only a single paragraph C criterion: the anxiety symptoms must "[result] in complete inability to function independently outside the area of one's home." 20 C.F.R. § 404, subpt. P., app. 1, § 12.06.    There is no indication that Plaintiff had any difficulty functioning outside her home.    She was capable of leaving home independently to attend therapy and school, to go to work during her brief periods of employment, to take her son to his daycare provider, and to run errands.    Therefore, because Plaintiff does not satisfy the paragraph B or C criteria for any relevant mental disorder, the ALJ's conclusion that her condition did not meet or equal any listed impairment was supported by substantial evidence.

## C.  The ALJ Properly Concluded that Plaintiff Was Capable of Working

### 1.  The ALJ Properly Assessed Plaintiff's Credibility

To "satisfy the substantial evidence requirement, 'the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.'" Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *4 (S.D.N.Y. June 23, 2008) (quoting Brodbeck v. Astrue, No. 05 Civ. 0257, 2008 WL 681905, at *19 (N.D.N.Y. Mar. 7, 2008)).

> First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments could reasonably be expected to produce the pain or other symptoms alleged.  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a

claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

Id. at *4-5 (quoting Brodbeck, 2008 WL 681905, at *19); see also Meadors v. Astrue, No. 09-3545-cv, 2010 WL 1048824, at *3 (2d Cir. Mar. 23, 2010); 20 C.F.R. §§ 404.1529(c), 404.1512(b)(3).

Under this approach, the second stage of analysis may itself involve two parts. First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could "reasonably be expected" to produce such symptoms). Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed above. Gittens, 2008 WL 2787723, at *5. "It is a function of the [Commissioner], not the [reviewing courts] to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (quoting

<u>Aponte v. Sec'y of Health and Human Servs.</u>, 728 F. 2d 588, 591 (2d Cir. 1984)).

In the instant case, the ALJ found that, although Plaintiff did suffer from severe impairments, she was not as functionally compromised as had been claimed. (<u>See</u> <u>id.</u> at 20.) That conclusion was supported by substantial evidence.

First, although Plaintiff had a long history of psychiatric problems, she had not been hospitalized since the alleged onset date, suggesting that her symptoms had become less severe than they had been during her adolescence, or that she had gained greater control over them. During the period at issue, Plaintiff had undergone only sporadic outpatient treatment. Much of that was not voluntary: the Hlubik assessment was court-ordered, (<u>see</u> <u>id.</u> at 155), Plaintiff attended therapy at Family Care in the hope of avoiding jail time for credit card fraud, (<u>see</u> <u>id.</u> at 222), and she attended treatment at RCDMH in order to qualify for SSI benefits. (<u>See</u> <u>id.</u> at 210.) She had not taken medication for the last several years, apparently because she found the side effects problematic. (<u>See</u> <u>id.</u> at 301-02.)

Second, the medical evidence in the record supports the conclusion that Plaintiff's symptoms did not preclude all work activity. Dr. Kushnir assessed Plaintiff's capacity for work as "good." (<u>See</u> <u>id.</u> at 216.) Dr. Herrick found that Plaintiff retained the capacity to understand and carry out work-related

tasks, though she would do best in a position that did not require significant social interaction. (See R. at 175.)   Although Mr. Bleiwas expressed vague misgivings about Plaintiff's ability to handle a normal work environment, writing that her condition "could be expected to interfere with employment," that conclusion was at odds with his specific findings regarding Plaintiff's functional limitations.[7] (See R. at 170, 252.)   Bleiwas found that Plaintiff had only mild and moderate limitations in her ability to do work-related activities - he did not characterize a single one of Plaintiff's impairments as "extreme" or even "marked." (See R. at 238-240.)   Moreover, he also wrote that Plaintiff's judgment was generally good, (see id. at 240), and that her depression, impulse control, and anxiety were improving. (See id. at 246.)   Dr. Helprin found that Plaintiff would likely need a supervised workplace until her treatment took full effect, but determined that Plaintiff was able to handle simple, rote tasks independently, and would be able

---

[7] The ALJ also found that Bleiwas was not an "acceptable medical source" under Social Security regulations, because he was a social worker, not a physician or licensed psychologist. (See R. at 21.)   See also 20 C.F.R. §§ 404.1513(a), 416.913(a). Although an ALJ must still consider such evidence, "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"   SSR 06-03P.   Here, the ALJ properly weighed the opinion evidence from Mr. Bleiwas, but found that it was contradicted by his specific findings about Plaintiff's abilities.   She therefore chose to give greater weight to the opinion of Dr. Kushnir, who had also evaluated Plaintiff in a clinical setting, and, as a physician, was an acceptable medical source.   (See R. at 21.)

to deal appropriately with stress if she had consistent treatment. (See id. at 170.)   Furthermore, in nearly every mental status evaluation, Plaintiff is described as being fully cooperative and well oriented to her surroundings, with clear speech and normal thought processes.   (See id. at 158 (Hlubik assessment), 168-69 (Helprin assessment), 215-16 (Kushnir assessment), 247, 250 (Bleiwas assessment).)   The only exception was Dr. Herrick, whose report did not discuss those functions. (See id. at 175.)

The record does indicate that Plaintiff has struggled to maintain employment for more than a few months at a time.   However, it is not clear that those difficulties were attributable to her psychological symptoms.   For instance, she testified that she had been let go from her job as an assistant manager of a clothing store because her childcare responsibilities caused her to miss too much work, (see id. at 270), and she gave inconsistent accounts of her reasons for leaving her telemarketing job with Union Federal, first saying that she left because she wanted more money, and then that she had been let go because of her romantic relationship with a coworker.   (See id. at 299.)

Finally, Plaintiff's own testimony suggests that she herself believed she was capable of working. (See id. at 277.) During the second hearing, when the ALJ asked Plaintiff to explain why she did not believe she was capable of working as a telemarketer or in a clothing store, as she had in the past, Plaintiff responded "I'm

confident that I can do it." (<u>Id.</u>) Plaintiff testified that she thought she would have difficulty getting to work on time, which would cause her anxiety to build, but she did not say that she anticipated any difficulties with the work itself. (<u>See</u> <u>id.</u>) Those statements were not consistent with Plaintiff's claims that she was completely disabled. Therefore, the ALJ was reasonable in concluding that, although Plaintiff did "experience some degree of psychiatric symptoms," the evidence did not support a conclusion that Plaintiff was completely unable to work. (<u>See</u> <u>id.</u> at 20.)

### 2. The ALJ Properly Relied on the Vocational Expert's Testimony

The ALJ's determination that Plaintiff retained the functional capacity to perform unskilled work, such as work as a telemarketer or small parts assembler, was supported by substantial evidence.

At the fifth step of the sequential analysis, the burden of proving that the claimant is capable of substantial gainful activity falls on the Commissioner. <u>See</u> <u>Butts</u>, 416 F.3d at 103; <u>Perez</u>, 77 F.3d at 46. "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." <u>Rosa</u>, 168 F.3d at 78 (2d Cir.1999). However, "exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." <u>Id.</u> In particular, where the claimant has significant nonexertional impairments, "the Commissioner must introduce the testimony of a vocational expert (or

other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Id.

Here, the ALJ properly relied on a combination of the medical-vocational guidelines and the testimony of the vocational expert, Pat Green.  (See R. at 22.)  An ALJ may rely on a vocational expert's response to hypothetical questions, provided there is evidence in the record to support the hypothetical assumptions.  See Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983).  The limitations described in the ALJ's hypotheticals, such as a mild restriction in maintaining concentration, persistence, and pace, a moderate limitation in sustaining social functioning, and stress-related difficulties with interpersonal interaction, conformed to the evidence in the record, including the evaluations supplied by Plaintiff's treating clinicians, Dr. Kushnir and Mr. Bleiwas, and Plaintiff's own description of her symptoms.  In response, Green testified that an individual with Plaintiff's limitations would be capable of working as, inter alia, a telemarketer, a small parts assembler, a garment sorter, or a ticket-checker, all listed as unskilled occupations in the Dictionary of Occupational Titles. (See R. at 280-81.)  Green also testified that those occupations exist in significant numbers in the national economy.  (See id.)

The ALJ concluded that the expert's conclusions were consistent with Social Security regulations, and with the medical-vocational guidelines, and concluded that Plaintiff was capable of performing

work that existed in the national economy. (See R. at 22.) Therefore, the ALJ properly found that Plaintiff was not disabled.

## Conclusion

Because the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence, this Court recommends that Defendant's motion for judgment on the pleadings be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable John G. Koeltl, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Koeltl. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 145, 106 S. Ct. 466, 470 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: June 23, 2010
        New York, New York

42